Good morning. May it please the Court, Robbie Manasse for Military-Veterans Advocacy. Congress passed the AMA to make the appeals process for veterans better, but several aspects of the VA's final rule make the process worse. MVA challenges three. Our first challenge is to the rule's categorical refusal to consider acute claims based on changes in judicial interpretation. And before diving into the merits, there's just one overarching point that's easy to miss in the briefing that I want to make clear, and that's that the VA already recognizes the way that a long final decision can be revisited based on a change in judicial interpretation. It's called a supplemental claim. The problem is that route is... Mr. Manasse, this is Judge Chen talking. Could you first start with the question of standing for MVA to challenge these three regulations? I understand we have an opinion DAV v. Gober, which at least suggests, perhaps strongly suggests, that having members of an association that are veterans alone could be good enough to establish associational standing for the organization to challenge VA regulations. But as you know, standing is an issue in tomorrow's NBank case. And so this is all going to be revisited tomorrow. I don't have a crystal ball. I can't say what's going to happen in tomorrow's NBank case, but I would be interested in hearing why you believe MVA has standing in light of Supreme Court case law on associational standing, which, at least from my reading, appears to be pretty demanding in the scrutiny it gives in terms of understanding whether a given association, in view of any members, actually have injury impact against some final agency action. So if you could speak to standing, I'd appreciate it. Sure. So Judge Chen, we've gone well above DAV's one veteran member standard, and the VA doesn't dispute that we need to second and third prompts of associational standing. So the question is, as I've already put it, do we have a member that has an injury impact? And we do. As to the Q challenge, we have MVA veteran members who have had pending Q motions that haven't been granted, and they've been forced to litigate these issues further. We have Mr. Hodge, and we also have an MVA client of Commander Wells, Mr. Hammack, who have both filed Q motions based on changes in judicial interpretation, and the VA refused to act on them. And so they are pushing for those claims to be heard as Q, but they're not able to get them heard as Q. That's because they can be heard as supplemental claims in light of last year's congressional act that was passed that make Blue Water Navy vets whole. Am I right about that? So, no. There is no requirement in the interpretation based on Procopio to be filed as supplemental claims. There is no requirement. All the Blue Water Navy Act says is that if you file a claim that was denied beforehand, and it would be allowed under the Blue Water Navy Act's terms, you can trace your effective date back to the original denial. But that's just permitting you to pursue the supplemental claim path. So, the only basis on which the VA has rejected these Procopio-based Q claims is based on its understanding of Q and the Q exclusion. So, if the Q exclusion is... If you could just... I'm just trying to follow your line of thinking. If there are two potential pathways to get to the finish line of benefits, and one path is wide open for the claimant, and the other one is closed off, what is the harm to the claimant by just taking the path that's wide open to receiving the benefits? Well, the harm is manifold. I mean, first, you've got people who have pending Q claims. And so, they already have Q motions teed up, ready to be decided, ready to be granted. And what the VA is doing is forcing them to refile. So, they have to go through the hassle of refiling as a different sort of claim. And there's this delay that's... I mean, when you've got a Q motion teed up on Procopio, that's ready to be decided. But now there's this delay in having to resolve it. So, even putting effective date aside, there is clear harm. We've also had evidence that Blue Water Navy veteran members of the organization have a harder time getting attorneys to represent them. And they need attorney representation to vindicate their claims. That's why I wanted to sort of mention this point about the supplemental claim path and the Q claim path and how they're all related. The VA's final treatment of supplemental claims prevents a supplemental claim that's older than a year to be something that an attorney can get fees for. But that's precisely what these Procopio-based claims are because these claims were filed. They were denied long ago, well over a year ago. And that's going to be true of most changes in judicial interpretation. They're going to reflect the practice that has been going on for a while. And so, the supplemental claim path doesn't allow attorneys to get fees. And the Q claim path doesn't either because the final rule categorically prohibits Q claims from being filed based on changes in judicial interpretation. And so, the upshot is that attorneys aren't getting fees and that disincentivizes them from taking work. So, it's harder for MVA, Blue Water Navy veteran members, and just veterans more generally to pursue their claims because it's harder to find attorney representation. As to the other challenges, I mean, on the fees, we have clear harm. MVA's attorneys are directly regulated. Commander Wells has submitted the declaration that he was denied over $50,000 in fees based on this prohibition. If we're not harmed by this, no one is. Right. How about the last rule? So, the last rule is to the docket switching bar based on the submission of evidence. And there, we have identified a substantial and credible risk of harm. Both our attorney members and our veterans are people who regularly appear before the board to pursue claims. And this is a procedural right where imminence is at its lowest as a requirement of imminence. And it's straightforward how hamstringing one's ability to pursue the vehicle of their claims that best suits indicating the claim is going to hurt them. So, there's a substantial and credible risk of harm both to MVA attorney members and MVA veteran members based on this procedural prohibition. This is Judge Clevenger. But unlike your identification of Hodge with respect to Q and Wells with respect to the attorney's fees, I didn't see you identifying an individual name of a member veteran who would have a claim vis-a-vis the docket switch. Right. So, that is correct. You don't... There is no name associated with anybody with a claim on the docket switch, correct? That is correct. There is no one with a currently pending claim. But we have identified Commander Wells and Mr. Hood have both submitted declarations that their practice has been affected because this is in sort of their wheelhouse going before the board. And this affects them in terms of the work that they'll take on. So, again, this is a 38 U.S.C. 502 allows for pre-enforcement review, not mid-enforcement review or post-enforcement review. It allows for pre-enforcement review. And all we need to show is a substantial threat of harm. And there is one here as shown by the Wells and Hood declaration. If I could turn to the merits, I would like to turn to the first challenge on the Q exclusion. So, I was making the point that the VA already allows these claims to be raised as supplemental claims. And that dispatches of the VA's phantom of administrative efficiency being harmed. These claims can already be brought just in a different vehicle. All we're trying to do is to get veterans the benefits they deserve, the best effective state that they can get. And in depriving veterans of their benefits, the exclusion here is wrong three times over. It's contrary to this court's case law. It's contrary to the regulation that the exclusion interprets. And it's also contrary to the statute that the regulation implements. So, on the case law, this court's case law is alone dispositive. This was a question that was squarely addressed in the Patrick decisions. This court analyzed the Q claim brought under the parallel board level Q regulation, which contains... Mr. Manas, are you talking about the non-presidential Patrick opinion right now? I am talking about both Patrick 2, which was non-PREC, and Patrick 3, which was PREC. And Patrick 3 made this determination in Patrick 2 opinion was about EJIA fees. Is that right? That's correct. That's correct, Your Honor. But I want to explain. So, the EJIA fees question, it all wrote on this question of whether the government was substantially justified in its position. If it was, it could have avoided fees. And in analyzing that question, the court asked, did the VA's position have a reasonable basis in said, you need to consider this question of what Q claims can constitute. What Patrick 2 said, said Q claims can be grounded in changes in judicial interpretation, and that is the law. And the VA needs to explain whether it was substantially justified in its position, it had a reasonable basis to argue otherwise. And this court was saying, was suggesting, no, it didn't, and said that this was very relevant. So, it was material for the outcome of this case, of the Patrick 3 case, even though it was about fees. The question was, was the VA's contrary position have a reasonable basis in law? And as Patrick 2 indicated, it did not. This is, I just have a quick question. My understanding is, is that in 1997, when it comes to Q claims, Congress codified a long prior pre-existing administrative practice that was provided for in Rule 3.105. Is that right? That is correct, yes. Okay. So, when I look at the pre-1997 version of the VA's Rule 3.105, the first sentence, the first statement of that regulation is, the provisions of this section, referring to Q, apply except where, and then dot, dot, dot, there is a change in law or a Department of Veterans Affairs issue or a change in interpretation of law or a Department of Veterans Affairs issue. And that language carried forward in, after 1997, and then at least with the exact same language that we looked at in the DAV versus Gober opinion, we approved of that regulation. And I guess what I'm wondering is, it looks to me like there had always been an exception to Q when that barred a Q claim whenever there was a quote-unquote change in interpretation of law. And I don't see that phrase in the old regulation as being cabined in to just agency changes in interpretation of law or necessarily excluding judicial changes in interpretation of law. So, as I understand the DAV opinion, as I understand the agency's pre-1997 practice that got codified by Congress all along, there was an adoption of a conception of Q that precluded a Q claim based on any change in interpretation of law, including a judicial interpretation. And I was wondering if you could comment on this line of thinking. Sure. And I, perhaps I'll address DAV first and turn to... Oh, I see that I'm in my rebuttal, if you would just indulge me to answer the question. Cool. Sure. So, I was thinking I would address DAV first and then turn to the introductory passage you mentioned and this codification idea. So, all DAV did is it upheld the board's regulatory exclusion, but it didn't say what its scope was. It didn't say anything about whether it contemplated a change in interpretation of law by a court or an agency. And in fact, it indicated that it didn't encompass a change in interpretation by a court because the sum total of what it said is excited Russell, which our briefing explains, shows that changes in judicial interpretation aren't covered by the exclusion because Russell explains that Q is intended to conform the decision to the true state of the law. The true state of the law is what the correct interpretation of the statute or provision is, which is what the court is announcing. And it also cited Harper, but Harper didn't involve a change in interpretation of the meaning of a statute or regulation. It involved a new principle of federal law. It declared a certain type of... There was a certain type of taxing practice that was declared unconstitutional and Harper said it had to be applied on a case on direct review retroactively, but that was a new rule of federal law. That wasn't an interpretation of the meaning of a statute or regulation. So, there's no indication that DAV had any thought about applying this to changes in judicial interpretation. Okay. Let's stop there. Unless, Judge Clemenger, do you have any questions? No, I'm fine. Thank you. Okay. And Mr. Manasseh, we'll reserve three minutes of time for rebuttal. Let's hear from the other side now. Thank you, Your Honor. May it please the court, I'll just quickly start by addressing quickly a couple of issues on standing that the court and Mr. Manasseh discussed. And I'll start by addressing the situation of NBA's member standing with regard to the Q rule. And I want to address Mr. Manasseh's discussion of Mr. Hodge. And I think as Judge Chen pointed out, Mr. Hodge cannot demonstrate that he was injured or even has a prospective actual imminent threat of injury with regard to the Q rule because he is covered by the Blue Water Navy Act. And the Blue Water remedy that Congress undertook to allow veterans subject to the act, such as Mr. Hodge, to apply for benefits with an early or effective date without regard to whether Q existed or not. And so, in this case, Mr. Hodge cannot establish and NBA cannot establish on behalf of Mr. Hodge that he's injured in any way because it appears that the- under the Blue Water Act, does he-is he required to file a supplemental claim in order to pursue those rights? I'm not-I don't believe that-I'm not completely familiar with the Blue Water Navy Act. I don't believe that any veterans are required to file claims, but I believe if they want to the earlier effective date without regard to it being a supplemental claim, then I do believe that they have to file the supplemental claim, but the effective date- That's why I was asking. My reading of the Blue Water Act is that the effective dates for a Blue Water Act claim are stated in the statute, and the statute's key to the requirement to file a supplemental claim. Yes, Your Honor, but even if the Act requires a veteran to file a supplemental claim, a supplemental claim will then entitle them under the Act to an earlier effective date, not just the effective date. That's what I understood. They get their-they get to keep their earlier effective date. So, practically speaking, a Blue Water veteran seems to be required, and Mr. Miles can listen and come back on rebuttal if he thinks I'm wrong, they're practically required to file a supplemental claim to preserve their effective date. Once they file their supplemental claim, if the claim is rejected on any ground, then they can appeal to the BVA or take any of the other three options of high-level review, or they can go to the BVA. If they pursue-if they decide to elect not to pursue and let the final, they can file a Q claim, correct? Nothing bars them from filing a Q claim. If they let their decisions at the board or the regional office go final on the supplemental claim. Yes. Yes. What I'm trying to do is to put Mr. Hodge in a first-time perspective. So, if he's required now to file a supplemental claim, then he may well prevail on that, and they wouldn't have any problem. If he doesn't prevail on that, he has various options, including going to the BVA, going all the way through us, and then at least going through the CAVC, he can preserve his effective date by, you know, filing a Q after he loses there. So, he's not barred from filing a Q, and that may be some time before he would ever be filing a Q. No. By no means is he barred from filing a Q claim, and not only is he not barred from filing a Q claim, the Blue Water Navy Act and his supplemental claim in front of that would redress any injuries that he's alleging as a result of Procopio. At the time he would be filing his Q claim, there may have been some judicial determination that helps him. There may not be, correct? There's none with respect to his particular grounds for which he would object if his supplemental claim was denied. There's no existing law that would prevent him from winning a Q, correct? I don't think so, Your Honor. So far as we know. Yes, Your Honor. I'd then just like to touch briefly, as Mr. Manasseh did, on the docket switching rule. Ms. Bae, just to finish off this particular issue, I heard Mr. Manasseh drill down and reference a couple problems going with the supplemental claim route that thereby creates, in fact, some kind of injury to being deprived going the Q claim route. And I heard him say something about timing. I guess if you've already got a pending Q claim, why make Mr. Hodge go through this supplemental claim route? And then two, going the supplemental claim route is difficult because you're very likely to not have representation because currently there is no ability for attorneys to be compensated for this type of supplemental claim work. So I heard him describe two kinds of harms. Could you just speak to that? Yes, Your Honor. To address your second question first, I think that Mr. Manasseh's second point is belied by the fact that Mr. Hodge appears to have representation and NBA is assisting him. And so he can't demonstrate that he has not been able to get help with his supplemental claim because he, in fact, does have help with his supplemental claim. I don't know whose client he is exactly, but he's clearly a member of NBA and would be receiving some sort of assistance from NBA unless Mr. Manasseh tells me differently. With regard to your first point, I don't think that Mr. Manasseh or NBA in its supplemental briefing has established that getting a decision on Q would be any quicker or more accurate than a supplemental claim. And so given the vagueness of that allegation, I don't think that he can establish that Mr. Hodge has suffered any sort of injury by having to bring it under the Blue Water Navy Act as opposed to as a Q allegation. I'd like to just quickly touch on the docket switching rule only to point out that... Could you first do attorney's fees? Why isn't Mr. Wells' declaration sufficient to show standing on attorney's fees? Your Honor, in our supplemental brief, we initially disputed or questioned the vagueness, again, of Mr. Wells' declaration. We didn't think that he had offered enough particulars, but we do think that he has offered a good deal more particulars, including an attachment to his supplemental reply brief. So while we question why Commander Wells did not include a sufficient amount of information in the first place, we do think that he likely has standing to demonstrate NBA's associational standing regarding the fee rule. When you say you likely, is that a concession? Assuming that we find that all of the information that's been submitted with regard to Wells was timely submitted, did I just hear the government concede standing on attorney's fees for Wells? I think we could concede standing on attorney's fees. Thank you. Yes. And now just quickly on the docket switching, the sole point I want to make is that this is even more attenuated than the standing with regard to Q. At least in Q, they could point to one actual person, even though he hasn't actually demonstrated injury with regard to the docket switching. Could you just quickly speak to the inevitability idea that I was hearing from the other side, that it's inevitable that they're going to be faced with this conundrum of being blocked from doing a lane switch because they, on behalf of one of their clients, submitted some evidence? Well, they stated that they submitted evidence and that this shows inevitability, but I don't find that anything that they submitted showed any concrete worry about it actually being inevitable. I realize this gets into the merits a little bit, but there's no grounds to think that members are even likely to run into this issue. The docket switching rule permits three different, well, three different lanes after the initial decision, but then three different lanes also in front of the board. And the docket switching rule is actually very generous to veterans in allowing them to switch within the first 60 days. And even after that, if they show good cause, the only rule is that they can't switch after they and there's no reason to think that this is going to be any sort of concrete problem for any of their members, much less veterans in general, that they go all the way through with submitting evidence and testimony before they want to switch. So this is- Ms. Bias, Judge Clevenger, I would think the court could take judicial notice, given its experience with BVA claims, that at the BVA quite frequently while the case is at the BVA, there is evidence, new evidence and testimony. And so the likelihood of someone being in that time posture and wanting to switch dockets seems to be inevitable that that will arise. I agree with your honor that it seems inevitable that veterans- So if the occasion is inevitable, it will arise. Your argument would be, well, they can't name a person who's standing right in line now who wants to switch. Well, it's not only that, although it is true that they cannot name a single person that is even- Let me go on beyond that. I know this is all coming very quickly at us, but I understood Mr. Manasse also to say that with respect to this particular claim, we're dealing with a procedural right rather than a substantive right. And in the case of standing, I do believe the lesser is required to be shown where you're trying to deal with a procedural right. Would you agree with that proposition? If I- Sorry. Would you agree with the proposition that in the standing analysis, if what we're talking about is a procedural right, you have a lower threshold of showing in order to establish standing? Well, your honor, even agreeing with the proposition of law, I'm asking you? I agree that it's not exactly the same to establish standing without needing to- I believe that they, quote, not needing to meet all the normal standards for redressability and, quote, to this court's decision in salmon spawning. But I think it's important to note also that they're not challenging the docket switching rule as a procedural right. They're actually challenging the Q rule as a procedural right. I'm looking at their supplemental brief right now, and the Q rule is certainly not procedural as we established in our supplemental brief, so they're not even briefed. No, no, no. You got me wrong. We're trying to drill down on standing for the docket switching, 20.202C2? Yes. And what I was trying to get at is that Mr. Manasseh made the point that he believes that this is a procedural right to switch dockets. In briefs and the other cases the government has made an argument that something is a substantive right like Q as opposed to this. If this is indeed a procedural right, is there a lower threshold we should be looking for for the personal harm? That's my question. Yes, Your Honor. I was simply trying to point out that MVA in its brief- I'm not entirely positive what Mr. Manasseh said about it in the argument today, but MVA in its brief never alleged that the board switching rule was a procedural right. They only alleged that with regard to Q. Can I come back, please? This is very quickly precise stuff. Let's assume that we were looking at the standing issue on the docket switch, and let's say that if the government has conceded an inevitability, right, and the government has conceded that this is a procedural matter, is the only reason that you would think is that they have not identified a named person who is standing in line to make a docket switch? Well, Your Honor, I don't believe we've conceded that it's inevitable that they would try to switch after the submission of evidence, but assuming inevitability and assuming it's procedural, then I would believe that MVA has likely demonstrated standing regarding the docket switching, but we don't think that- Wait, wait, wait, wait. Be careful. Assuming that there is inevitability and assuming it's procedural, even without naming an individual who is seeking to assert his right, you say you would be willing to concede standing? I am not. I would need to look more closely at the standards for what standing is required. Assuming it's procedural, I don't have them quite at hand, but I do believe that they are more lenient, so I would need to look at those to have a firm answer on that, and I can, of course, submit one to the court if the court wishes us to dig into that issue, but- Well, let me just put a footnote to what I've been saying to you to maybe give you a little prompt, give you a little relief. The government can't concede standing. We have to decide ourselves whether they're standing, but the purpose of my discussion with you was to test just exactly how you would see the procedural and the inevitability issues playing into this, so thank you for your comments. Thank you, Your Honor, and I believe I only have a few seconds left, so I would just ask whether the court would want or permit us to at least have the Q rule. Yes, go ahead and address the merits. Thank you, and of course, I will be as quick as possible. Very briefly. Yes. Okay. Ms. Bay, when it comes to the regulation, which is in front of us as well as the 1996 version of 3.105, the regulation talks about how Q applies except where there's a change in law or Department of Veterans Affairs issue or a change in interpretation of law or a Department of Veterans Affairs issue, and I just didn't understand what does Department of Veterans Affairs issue mean? Do you know? I'm not entirely sure. I admittedly did not go and look into exactly what that means simply because the issue at hand in this case was a change in interpretation or change in law, and so I'm not entirely positive what change in VA issue means, but I do believe that both versions of 3.105 make it very clear that changes in interpretation do not serve as grounds for Q, and just to address Mr. Manoff's arguments regarding the Q rule, they say that case law, the regulation, and the statute are all contrary to the conclusion that 3.105 precludes Q review on the grounds of a change in judicial pronouncement or a change in judicial interpretation of law. However, as we demonstrated in our brief, the case law, the regulation, and the statute, the regulation and the statute being informed by congressional intent all very clearly demonstrate that the regulation is valid and that judicial interpretations are precluded, but I would suggest that the court does not even need to reach those last two because DAV and Jordan are dispositive of this matter, and as Your Honor noted, Patrick 2 is not precedential, and Patrick 3 did not make Patrick 2 precedential, and therefore, there is no reason not to simply follow DAV and Jordan here, and there is no reason not to extend the rules regarding the board to rules regarding the agency of original jurisdiction, particularly because Congress had shown intent to treat them the same. With that, unless the court has any other questions, which I'm happy to field, we would ask I'm sorry, I do have one last question, and it relates to the NOD modification regulation. I did not see a specific response to the comment about this, how it would be burdensome or unfair to claimants to restrict their ability to switch lanes after they submit evidence, and the response to that seemed to be more about just general efficiency and things like that, but I don't understand right now sitting here why it's inefficient to deny a claimant the ability to switch lanes once the claimant has submitted some evidence. I don't understand what it is about that action, that receipt of evidence that causes the agency to fall down if a claimant subsequently wants to switch lanes. Could you explain? Yes, Your Honor. First, more broadly speaking, the AMA was put in place in order to help fix some of the efficiencies. I understand all that, and we only have a little bit of time. Could you just answer my specific question of why is there some real tangible inefficiency to permitting a lane switch after the submission of evidence? Well, Your Honor, I think as VA pointed out at Appendix 16 and 17, that there are inefficiencies with both making it difficult for VA to provide accurate data like wait time if veterans are allowed to switch basically at will, and that there's a need to balance the desire for veterans to change dockets against the needs of other veterans waiting for a board decision, and that those other veterans, if veterans were allowed to switch after evidence was submitted, so more or less whenever, that they would then, because they keep their original dockets. The question is why is it less efficient after the evidence as opposed to no evidence? Clearly, a veteran is allowed to switch dockets if there's no evidence or testimony involved, and so that's inefficient because it requires VA to jockey things around. Why is it more inefficient if evidence or testimony has come in? That's the question. Well, I think VA explained that the reason it's inefficient... The question is where does VA explain it in the public record? It doesn't work for you to come in here now and make an explanation for rationale. The rationale has to be on the record in order to save the regulation from arbitrary impreciousness. Yes, your honor. Where is there an explanation in the record of why it is more inefficient for the agency to switch a docket at the BVA if there's evidence or testimony compared to the inefficiencies if the request isn't based on those two reasons? Well, your honor, I think at the appendix pages 397 and 398, which I think was the notice of the proposed rule, the VA, I think, explained in those pages that the purpose of that particular prohibition about evidence and testimony would have been to prevent the appellant from unfairly advantage of two dockets. And this was supported again by then its response to the comments submitted with regard to the proposed rule. And VA, I think, explained on appendix 16 that it would give the veteran an opportunity to switch dockets and unfairly disadvantage other dockets or other veterans who might otherwise wait longer because the veteran who's switching gets the advantage of keeping their original get date. And so, they would then jump in line. Wouldn't that also be true if someone is trying to switch a docket but isn't using testimony or evidence as the basis? It would be true, but that's why VA has built in, I think, now a 60-day rule. It was before a 30-day rule. And I don't think the 60-day rule is at issue in this case. But that's why VA has built in safeguards and why the... That's after the fact. That's not in the regulations that are in front of us. I mean, you can't supply a rationale outside the record. It may well be that it's correct that you've cured the problem. No, Your Honor. I'm not trying to do that. I'm hearing you to say that the rationale explained at 397, 98, 16, 17 is only with regard to inefficiencies where someone is...or prejudice where someone has put in the new evidence because they're jumping a position over some other veteran who's waiting for his docket. Yes, Your Honor. VA... VA... Isn't the other veteran equally prejudiced if the docket changes without basis in evidence or testimony? I'm not entirely sure I understand Your Honor's question. Are you asking whether veterans are also prejudiced by veterans switching dockets before submitting evidence or testimony? Yes. I mean, I think that, yes, there is some level of some veterans are going to be disadvantaged by the docket switching rule. But it also, again, as VA explained, there has to be a balance. They're trying to balance the desire to change dockets and the right to change dockets against the needs of the other veterans waiting for their board decision. And VA determined and explained that 16, 17 and 397, 98 that with regard to both the time and the evidence submission that these rules were put in place to balance the needs of the veterans who want to switch versus the needs of the veterans that are waiting. And also referenced its own difficulties in providing accurate data, which was part of what it wanted to do, which is give accurate data regarding wait time to the veterans who are in front of the board. I'm sorry. I think I'm going to... I'm sorry. I do have another question for Ms. Bay, if I may. And it relates to the attorney's on 5104CB type supplemental claims. And Ms. Bay, when I read the two Federal Circuit opinions in Stanley and Carpenter that each went through the legislative, it seems clear to me that those opinions read as saying that the statute was designed to permit fees for any work performed after the initial decision. And so I don't know why that wouldn't also apply to this type of supplemental claim that we're talking about here as to this regulation, 14.636C1I. Your Honor, just to quickly... Am I misreading Carpenter? That's all I'm asking. We actually think that Stanley and the Sears case suggests that there's a different treatment for reopening a case versus the original case. And here, I think we established in our brief that this is not... It's treated essentially as a new case for the purposes of a supplement claim that is after a year. And that's why VA drew the distinction between supplemental claims that are continuous, i.e. within one year and part of the three lanes that a claimant can undertake versus a supplemental claim that's, you know, for example, 10 years down the line after the final. And so when the cases become final and a veteran submits a supplemental claim, it's essentially treated as a new case. And that's why the AOJ's decision would be treated as an initial decision. And I don't want to get too into depth because of time, but I think our brief establishes why there's such a distinction and a difference between supplemental claims that are filed on non-final decisions versus supplemental claims that are filed in final decisions. And just to finish up, I would note that the VJRA, as cited in our brief, suggests that Congress did not intend paid representation for vets who wait years without any action and then request a reopening and pursuit of the claim at the RO level. So I think that there is plenty of precedent and the congressional intent for treating supplemental claims on final decisions differently than supplemental claims that are part of the same initial decision because it hasn't been finalized yet. Okay. Let's, we can stop there and let's go back to Mr. Manas and I'm going to restore you back to three minutes. Thank you, Judge Rayna. A lot to respond to, just starting with standing on cue to address Judge Clevenger's question. There's clear harm that's already happened to Hodge and Hammock. They're being forced to face delay by refiling in a different path. And $500 now is worth a lot, is more valuable than $500 a year from now. Delay matters. I mean, hassle matters. And the Supreme Court precedent- Let's assume that there's no clear harm. What about the line of thought that Judge Clevenger was asking about, the inevitability line of thought? Well, so I believe the inevitability point was being raised with regard to the docket switching bar, which I agree it is inevitable given the practice of these veterans' attorneys and the situation of these disabled veterans who have claims. But it's also, I think, inevitable for the Q path. To be clear, Ms. Faye said we didn't claim that procedural right relaxed eminence applies across all claims. We did. It's in our supplemental brief. We said relaxed requirements for each challenge and that applies for two reasons as to Q. One is we have a right to pre-enforcement review under 38 U.S.C. 502, which furnishes the procedural right. And two is Q is a procedural path to benefits. Yes, it has a substantive... It matters substantively because it matters for benefits, but it's a procedural path. And so it is itself procedural as well. And there's no question that this court... That there's more than just Pro Copio claims out there. I mean, this court's jurisdiction is to review interpretations by the VA and the VA. Did you identify any besides the Pro Copio claims? Yes, we did. So the hood declaration at paragraph five mentions Hudgins. And in fact, cites to an opinion of the board relying upon the veterans' court's erroneous interpretations of Hudgins before this court reversed. And so those claims exist too. And I mean, there's no, as I said, this court's experience, this court's jurisdiction is to review erroneous interpretations. So it changes interpretations all the time. These things exist. And as a, you know, veterans deserve to be able to pursue the Q path. The Blue Water Navy Act doesn't require Pro Copio veterans to file supplemental claims. But even putting them aside, Blue Water Navy Act doesn't exist. It's not... Mr. Maas, doesn't the Blue Water Act specify how you get your effective date for a Blue Water claim? All it says is that if you file a claim, it doesn't say what type of claim. It could be a Q claim, a supplemental claim. It just says claim. It says nothing about supplemental claims. It just says effective date of award. The date of award shall be determined in accordance with section 5110. Exactly. And 5110 points you to a supplemental claim, doesn't it? No, it does not. It covers... 5110 doesn't point you to a Q claim. Right. But that's because we're basing these claims on Pro Copio. The Blue Water Navy Act sets up geographical points. It actually is, you know, not entirely commensurate with the Pro Copio holding. So this is a different thing. And again, it's not mandating... Pro Copio claim is broader than the statutory claim? I'm just saying you can bring a claim under either the statute or the Pro Copio change in interpretation. But even putting that aside, all 5110 speaks to is that the effective... But the Blue Water Act basically preserves the original filing date for a Blue Water claimant who files a supplemental claim. I understand... That's a guaranteed securing of the original filing date. Whereas if you go after Q, you might get the filing date. But if you lose your Q, you don't get it. So if you lost your Q, you're going to lose your entire claim, right? No, I don't agree. I think the Blue Water Navy Act would... I believe... I believe the Blue Water Navy Act would allow you to file a supplemental claim afterwards based on the Blue Water Navy Act. But again, I want to be clear about the effective date point. All it's talking about is effective date, not how you're required to file your claim. We know that Hodge and Hammond want to pursue Q claims. They're trying to pursue Q claims. And the Blue Water Navy Act doesn't exist for most veterans. This is a special circumstance, even if you accept your version of what it does. I mean, every other veteran out there, this is the exception that proves the rule. They're not going to get the benefit of the better effective date, and this needs to be fixed now. If I can just briefly address... Well, we're out of time. We're out of time, but I did want to let Judge Chen... Do you have any questions, Judge Chen? No, I'm okay. Thank you. Okay. If you can briefly conclude, Mr. Munoz. Sure. Thank you, Judge Reyna. So, on the merits, we should win on the case law, the regulation, and the statute on the Q claim. On the fees, I just want to point out, I mean, this is the plain text of the statute. And to address Judge Chen's point, I mean, about the case law, I agree wholeheartedly. I don't think I have to read any farther than this quote from Carpenter. A veteran's claim based on a specified disability does not become a different case at each stage of the often lengthy and complex proceedings, including remands as well as reopening. There's no doubt on the statutory text, the purpose of the AMA or this court's case law that fees should be allowed. And as for the docket switching bar, Ms. Bay didn't engage with the fact that the time bar already provides... Already guards against the inefficiencies she was mentioning, which, as Judge Clevenser pointed out, aren't in the final rule mentioned. But we're not challenging the time bar, so the VA needs to grapple with that problem separately. Thank you, Your Honors. Okay. We thank the counsel for their arguments. This case is now taken into submission.